# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **DEBORAH KIMBALL LORAH** | * | **CIVIL ACTION NO. 14-0749** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Deborah Kimball Lorah, born August 18, 1957, filed an application for a period of disability and disability insurance benefits on June 10, 2011, alleging disability as of October 1, 2007, due to neck pain, scoliosis, hyperlipidemia, GERD, stomach pain, anxiety and depression, chronic pain syndrome, metabolic acidosis, hypokalemia and cachexia.[1]

---

[1]Claimant's date last insured was June 30, 2012. (Tr. 10, 25). Thus, she must establish a disabling condition before the expiration of her insured status. *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Mental Residual Functional Capacity ("RFC") Assessment by Joseph Tramontana, Ph.D., dated August 11, 2011**.  Dr. Tramontana, the state consultative examiner, assessed claimant for affective disorders.  (Tr. 59-60, 389). He determined that claimant had a medically determinable impairment that did not precisely satisfy the diagnostic criteria.  (Tr. 59).  She had no restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in concentration, persistence or pace, or repeated episodes of decompensation.

**(2) Physical RFC Assessment by Dr. Charles Lee dated September 8, 2011**.  Dr. Lee, the state consultative examiner, found that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk and sit about six

hours in an eight-hour workday, and had unlimited push/pull ability.  (Tr. 60-61).

She could occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds;

frequently balance, and occasionally stoop, kneel, crouch and crawl.  (Tr. 61).  She

was also limited as to reaching any direction, including overhead, with both arms.

(Tr. 62).  He determined that she had a light residual functional capacity ("RFC").

(Tr. 398).

### (3) Records from David Greenway, Ph.D., dated August 10, 2011.

Claimant described herself as a sociable person who liked people and had

several friends.  (Tr. 384).  On mental status examination, her psychomotor

activity was normal.  (Tr. 385).  She had no indication of psychotic symptoms.

Her receptive skills were good.  She could follow multi-step directions.  (Tr. 386).

Claimant's insight and judgment appeared adequate.  Recent and remote

memories appeared intact.  (Tr. 386).  Behavioral pace, effort and persistence were

good.  Her intelligence was estimated in the average range of intellectual

functioning.

Dr. Greenway's diagnosis was adjustment disorder with mild depression

and anxiety, which appeared to be fairly well-controlled with medication.  She

showed no significant impairment related to mental health.  Her mental status was

good, and she had no indication of major, severe psychiatric syndromes.

Claimant's cognitive skills were adequate to understand, remember and carry out detailed instructions, and maintain attention to perform simple repetitive tasks for two-hour blocks of time.  She was able to tolerate the stress associated with day-to-day work activity and demands.  She should be able to sustain effort and persist at a moderate pace over the course of a routine 40-hour workweek. Her social skills were adequate, and she should be able to relate to others, including supervisors and co-workers, in employment settings.

**(4) Records from Dr. Stephen O'Neil dated July 14, 2008 to June 6, 2012**.  On July 14, 2008, claimant reported a history of a cervical fusion in 2004. (Tr. 254, 296).  She complained of pain in her low back and neck.  She took Lortab four times a day due to severe pain.

On examination, claimant had tenderness of the cervical and lumbar areas. Dr. O'Neil's assessment was status-post cervical fusion.  He informed claimant to be careful with Hydrocodone.

On November 7, 2008, claimant had been taking up to five Lortab per day. (Tr. 268).  She denied any adverse side effects with narcotics.  Dr. O'Neil told her to be very careful with narcotics, and not to receive any narcotics from other physicians.

On January 5, 2009, claimant reported driving to Delaware for the holidays, which had increased her neck pain.  (Tr. 267).  She continued taking five Lortab per day. She indicated that she continued to work.  She denied any sedation or other adverse side effects from medications.

On May 13, 2010, claimant had mild to moderate diffuse tenderness of the cervical spine with fair range of motion and normal upper extremity strength. (Tr. 260).  She stated that she would try to cut back on Hydrocodone later that year. On November 9, 2010, she reported having less pain and muscle spasms with medications, so she could be more active and independent.  (Tr. 258).

On February 8, 2011, claimant continued taking five Lortab per day and Soma twice a day.  (Tr. 257).  She did almost all of the household chores. Claimant understood that medications could be addictive, and that she was not to receive any narcotics from other physicians.

On July 27, 2011, claimant continued with severe neck pain and reported moderate muscle spasms.  (Tr. 405).  She was taking Lortab five per day and Soma twice per day, and said that medications were helpful.  She denied any adverse side effects or tolerance with medications.

On January 9, 2012, claimant continued having moderate pain.  (Tr. 403). She continued taking one Soma twice a day and Lortab five per day.  She believed

that medication helped decrease her pain level, and denied any adverse side effects or tolerance with medication.  She reported an activity level of 10.

On April 5, 2012, claimant reported continued moderate, severe neck pain and muscle spasms.  (Tr. 402).  She did believe that medications helped decrease pain, and denied any adverse side effects or tolerance.  She reported an activity level of 10.  She had moderate cervical spine tenderness and 5/5 upper extremity strength.

On July 6, 2012, claimant continued with moderate to severe neck pain and mild to moderate muscle spasms.  (Tr. 401).  She had been taking Soma twice a day and Norco five per day.  She reported no adverse side effects or tolerance with medications.  She continued to be very active and independent.

**(5) Records from Dr. Glen Guillet dated January 24, 2008 to July 27, 2012**.  On January 24, 2008, claimant complained of weight loss.  (Tr. 217).  On back exam, she had a right scoliotic curve.  (Tr. 218). Claimant had a history of an anterior cervical discectomy and fusion of C5-6 in May of 2004 by Dr. Cobb.  (Tr. 221).

Dr. Guillet's diagnoses were rapid weight loss of unknown origin; hypokalemia; status-post cervical disc disease, post C5-6 discectomy, plating and fusion in 2004; scoliosis of the thoracolumbar spine; chronic pain syndrome,

habituated to Lortab, with rebound headaches; migraine headaches periodically by history; tobacco abuse, and Hydrocodone habituation with consumption of Lortab four or five times a day.  (Tr. 218, 351).

On February 11, 2008, claimant was 5 feet 3 inches tall and weighed 77 pounds.  (Tr. 349).  The assessment was weight loss, chronic pain syndrome, anxiety/depression, cachexia, prescription Hydrocodone habituation, scoliosis and tobacco abuse.  Dr. Guillet prescribed a trial of Remeron and Norco.

An MRI of the lumbar spine On February 27, 2008 showed mild disc bulging without significant stenosis or nerve root impingement.  (Tr. 213, 374).

On June 17, 2009, claimant complained of migratory joint pain, anxiety and depression.  (Tr. 330).  She noted that she had received a promotion recently.  Her physical exam remained essentially stable.

Dr. Guillet's diagnoses were polyarthralgia, osteoporosis with associated pain in hips and back, GERD, Vitamin D insufficiency, secondary hyperparathyroidism, chronic pain secondary to disc disease post-cervical spine fusion, and chronic anxiety/depression.  He increased her Lexapro and continued her on Remeron, Lunesta, Lortab, Alprazolam, Protonix and Actonel.  (Tr. 330-31).

In May, 2010, Dr. Guillet noted an escalation in claimant's use of narcotics. (Tr. 197, 286).[2]  He stated that claimant had been obtaining prescription refills for her husband and using his medications in addition to hers, and also buying medication on the street.  (Tr. 286, 353).  He noted that Dr. O'Neil had prescribed Soma, and counseled claimant regarding the adverse combination of Hydrocodone and Soma.   (Tr. 287).

Dr. Guillet's diagnoses were auto-immune euthyroiditis, folic acid deficiency, GERD, hyperlipidemia, anxiety/depression, chronic pain syndrome secondary to cervical disc disease, status-post cervical spine procedure, narcotic abuse, GERD with esophagitis, metabolic acidosis, hypokalemia and cachexia. (Tr. 197, 287).

On August 15, 2010, Dr. Guillet opined that claimant should have in-patient management for severe depressive syndrome, preferably narcotic withdrawal.  (Tr. 283).

On December 17, 2010, claimant reported feeling better due to increased weight gain.  (Tr. 282).

---

[2]Records from Christus Hospital – St. Elizabeth in Beaumont, Texas, dated May 5, 2010, noted that claimant had a narcotic addiction with tobacco abuse.  (Tr. 215).

8

**(6) Consultative Examination by Dr. Christopher Matt dated August 13, 2011**.  Claimant complained of neck problems, scoliosis, hyperlipidemia, stomach pain, anxiety, depression, chronic pain syndrome, GERD, metabolic acidosis, hypokalemia, and cachexia.  (Tr. 391).  She claimed that her cervical fusion, muscle spasms in her legs, and lower back and tailbone pain prevented her from working.  She reported a history of migraine headaches, gastritis and esophagitis.  She smoked one-half pack per day.  (Tr. 392).

On examination, claimant had no muscle asymmetry, atrophy, or involuntary movements.  (Tr. 393).  Straight leg raising was positive at 45 degrees on the right and 40 degrees on the left.  Gait/station was normal.  She was able to rise from a sitting position without assistance, stand on tiptoes, heels and tandem walk without problems, and bend and squat without difficulty.

Grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects bilaterally.  Claimant had no edema, cyanosis, or erythemia of the extremities.

On mental status exam, claimant was alert and oriented to time, place and situation.  She did not appear depressed or anxious.  Recent and remote memory was intact.  She had good insight and cognitive function.

9

Neurologically, claimant had strong neck movement against resistance and good shoulder shrug.  She had good tone and muscle strength 5/5 bilaterally.  She normal reflexes and sensory.

Dr. Matt's diagnoses were thoraco-lumbar spinal scoliosis, degenerative disc disease of the spine, status-post cervical spinal fusion, and spondylosis at L2-3, L3-4.  He opined that claimant should be able to sit, walk and/or stand for a full workday.  Her ability to bend down was limited presumably by her scoliosis.  Her capacity to lift/carry objects was limited by the restricted range of neck motion from her prior cervical fusion.  Her ability to hold a conversation, respond appropriately to questions, and carry out and remember instructions was normal.

**(7) Claimant's Administrative Hearing Testimony**.  At the hearing on October 11, 2012, claimant testified that she had completed the 11th grade.  (Tr. 28).  She completed training in phlebotomy.  (Tr. 29).  She had past work experience as a cashier, stocker and club manager.  (Tr. 29-32).

Regarding complaints, claimant testified that she starting having neck and back pain and headaches several years prior.  (Tr. 33).  After her cervical fusion in May, 2004, she returned to work at ShopRite primarily as a cashier.  (Tr. 33-34).  She stopped working because she could not do her job correctly.  (Tr. 34).

Claimant complained that she still had constant neck and back pain.  (Tr. 35).  She said that medication eased the pain, and that weather aggravated it.  She stated that the medication made her drowsy, forgetful, and unable to concentrate. (Tr. 36, 41-42).

Additionally, claimant had anxiety and depression, for which medication helped.  (Tr. 36-37).  She also had problems sleeping, but medication helped.  (Tr. 39-40).

Regarding restrictions, claimant testified that she could sit and stand for about 10 to 15 minutes before having to move around.  (Tr. 36).  She stated that she could not walk very far, except to go outside and feed her dogs.  (Tr. 41).  She did not do any lifting.

As to activities, claimant testified that she watched TV, did laundry, and swept in intervals.  (Tr. 37).  She stated that she could not wash dishes because of back pain.  (Tr. 38).  She had no difficulty with dressing and bathing.  (Tr. 40). She said that she could not concentrate long enough to read.  (Tr. 44).

Claimant reported that she had stopped driving in 2012 because she could not sit that long.  (Tr. 38).  She said that her husband had been doing the grocery shopping and most of the housework for the past year.

**(8) Administrative Hearing Testimony of Donald Rue, Vocational Expert ("VE")**.  Mr. Rue classified claimant's past work as a cashier/checker as light with a Specific Vocational Preparation ("SVP") of 3; store's laborer as medium with an SVP of 2; liquor establishment manager as light with an SVP of 6; waitress as light with an SVP of 3, and bartender helper as medium with an SVP of 2.  (Tr. 47-48).  He testified that the liquor establishment manager position would contain some transferable skills.  (Tr. 48).

The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education and work experience; who was limited to sedentary work, and could occasionally climb stairs or ramps, stoop, kneel, crouch or crawl, and occasionally reach overhead.  (Tr. 48-49).  In response, the VE testified that she could work as a circulation clerk, of which there were 98,860 positions nationally and 1,214 statewide.  (Tr. 49).

When the ALJ changed the hypothetical to assume a claimant who was limited to light work with the same limitations, Mr. Rue responded that she would still be able to do the cashier/checker position.  (Tr. 50).  For the cashier position, he testified that 90,598 positions existed nationally and 1,171 statewide.  (Tr. 51).  However, when the ALJ asked if she could do any of the jobs that she had performed in the past if she could perform only unskilled light work with those

same limitations, or unskilled sedentary work, the VE responded that she could
not.

   **(9) The ALJ's Findings**.  Claimant argues that the ALJ erred: (1) in failing
to find that she was disabled prior to her date last insured and, therefore, entitled
to benefits; (2) alternatively, in failing to find that she was disabled for a period of
time prior to her date last insured and, therefore, entitled to a closed period of
disability benefits, and (3) in finding that her testimony and complaints of pain
were inconsistent and not credible.

   First, claimant argues that the ALJ erred in concluding that she could
perform light work.  [rec. doc. 10, p. 6].  In assessing claimant's residual
functional capacity ("RFC"), the ALJ gave great weight to Dr. Matt's opinion that
claimant could sit, walk, and/or stand for a full work day, with limitations as to
bending due to scoliosis and lifting/carrying due to her prior cervical fusion.  (Tr.
16, 393).  She also gave great weight to the state agency medical consultant's
opinion that claimant could perform light work with postural limitations.  (Tr. 60-
61).  As the ALJ's RFC finding is supported by the medical records, it is entitled
to deference.

Claimant also argues that the ALJ failed to give proper weight to the vocational expert's opinion that a person with her limitations and conditions would not be employable for long.  [rec. doc. 10, p, 6].  However, it is well established that the  ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ.  *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir.1985); *Bayer v. Colvin*, 557 Fed.Appx. 280, 287 (5th Cir. 2014).

Here, the ALJ rejected claimant's testimony based on the evidence of record.  (Tr. 14).  As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

Next, claimant asserts that she is unable to engage in substantial gainful activity on a day-to-day basis, citing *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986) [rec. doc. 10, p. 7].  However, since the issuance of its decision in *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), the Fifth Circuit has determined that the Commissioner is not required to make a specific finding regarding the claimant's ability to maintain employment in every case.  *Dunbar v. Barnhart*, 330 F.3d 670,

672 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  As the

court stated in *Frank*:

> *Watson* requires a situation in which, by its nature, the claimant's
> physical ailment waxes and wanes in its manifestation of disabling
> symptoms.  For example, if [plaintiff] had alleged that her
> degenerative disc disease prevented her from maintaining
> employment because every number of weeks she lost movement in
> her legs, this would be relevant to the disability determination.
> **At bottom, *Watson* holds that in order to support a finding of
> disability, the claimant's intermittently recurring symptoms
> must be of sufficient frequency or severity to prevent the
> claimant from holding a job for a significant period of time**.  An
> ALJ may explore this factual predicate in connection with the
> claimant's physical diagnosis as well as in the ability-to-work
> determination.  Usually, the issue of whether the claimant can
> maintain employment for a significant period of time will be
> subsumed in the analysis regarding the claimant's ability to obtain
> employment.  Nevertheless, an occasion may arise, as in *Watson*,
> where the medical impairment, and the symptoms thereof, is of such
> a nature that separate consideration of whether the claimant is
> capable of maintaining employment is required.

(emphasis added).  *Id*. at 619.

Here, claimant has not demonstrated that her symptoms were of sufficient

frequency or severity to prevent her from holding a job for a significant period of

time as required by *Watson*.  Neither her treating physicians nor the consultative

examiner found that her alleged symptoms would prevent her from working.

Thus, this argument lacks merit.

15

Next, claimant argues that the ALJ erred in assessing her credibility.  [rec. doc. 10, p. 7].  Specifically, she asserts that a claimant with a good work record is entitled to substantial credibility when claiming that she can no longer work due to a disability.  *See, Melancon v. Astrue*, 2012 U.S. Dist. LEXIS 106882, at *19 (W.D. La. June 6, 2012) (citing cases from other circuits).   However, while claimant is correct that there is jurisprudence from other circuits holding that a claimant with a good work record is entitled to substantial credibility when claiming that she can no longer work due to a disability, that is not the case here, where claimant had a sporadic work history with gaps in some years.  (Tr. 121-127).  But, assuming that the ALJ had afforded claimant an extra measure of credibility because she was a good and faithful employee, the ALJ would remain justified in finding that she is not disabled based on the reasons set forth below.

The ALJ found that claimant's subjective complaints were not fully credible.  (Tr. 15).  As to her testimony regarding problems with depression and anxiety, the ALJ noted that her only treatment as of her date last insured had been medication.  The ALJ further observed that claimant had not had any counseling, and that her treating physician, Dr. Guillet, had never referred her to a mental health care specialist.

16

Additionally, the ALJ noted Dr. Greenway's observation that claimant's mental health problems were fairly well-controlled with medication.  (Tr. 15, 386).  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Further, the ALJ noted that claimant had testified to severe, chronic pain. (Tr. 15).  To prove disability resulting from pain, an individual must establish a medically determinable impairment that is capable of producing pain.  *Ripley*, 67 F.3d 552, 556 (5th Cir. 1995).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *Id*.  Disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by objective medical testimony.  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

The ALJ observed that Dr. O'Neil had treated claimant for pain since July 2008.  (Tr. 15).  However, neither Dr. O'Neil nor Dr. Guillet had observed claimant having any signs of chronic and disabling pain.  Instead, the medical

records show that claimant had no muscle atrophy and had gained weight.  (Tr. 282, 392-93).  It is well established that the absence of objective factors indicating the existence of severe pain -- such as limitations in the range of motion, muscular atrophy, or impairment of general nutrition, can justify the ALJ's conclusion that claimant does not suffer from "severe, persistent, and intractable pain" which preclude the performance of all work activities.  *Hollis v. Bowen*, 837 F.2d 1378,1384 (5th Cir. 1988).

Additionally, the ALJ noted that claimant had testified to side effects from medications.  However, the ALJ observed that while Dr. O'Neil had asked her about medication side effects numerous times, claimant denied having any.  (Tr. 267, 268, 401, 402, 403, 405).  *See Salazar v. Chater*, 1995 WL 783347, *5 (5th Cir. 1995) ("It is logical to assume that if the claimant were suffering significantly from any side affects [sic], the claimant would have complained to his treating physician, yet he has not done so.").

Another credibility factor considered by the ALJ was claimant's abuse of pain medication.  (Tr. 15).  The ALJ noted that Dr. O'Neil had instructed claimant on several occasions not to receive any narcotics from other physicians.  (Tr. 255, 257, 261, 263, 267, 268, 269).  Additionally, Dr. Guillet was concerned about

18

claimant's over-medicating and narcotic pain abuse.  (Tr. 197, 286, 287, 351, 353).

In May 2010, Dr. Guillet commented on claimant's obtaining prescription refills for her husband and using his medication in addition to hers, and buying medications on the streets.  (Tr. 286, 353).  Additionally, the ALJ noted Dr. Guillet's concerns over Dr. O'Neil's prescribing Soma in combination with Hydrocodone.  (Tr. 287).  Claimant's drug abuse, which is replete through the record, belies her credibility.  *See*, *Pratt v. Barnhart*, 158 Fed.Appx. 643, 645 (5th Cir. 2005) (claimant's complaints of pain found not credible where evidence existed of her "drug-seeking" behavior).

Further, the ALJ observed that Dr. Guillet had instructed claimant to stop smoking.  (Tr. 15).  However, treatment notes indicate that she did not cease smoking until March 2012.  (Tr. 422).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685 n. 4 (5th Cir. 1990). This, the ALJ's credibility finding is entitled to great deference.  *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

Next, claimant argues that the ALJ did not give any credence to and did not rely on her testimony regarding her daily activities.  [rec. doc. 10, p. 7].  However,

19

the ALJ specifically referenced claimant's testimony regarding her daily activities, including the fact that she could wash clothes, watch television and perform personal hygiene without assistance.  (Tr. 14).  Her Adult Function Report also indicates that she grocery shopped, cleaned house, prepared several-course meals, and read.[3]   (Tr. 166-69).  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558, 565 n. 12 (5th Cir. 1995).

Finally, claimant argues that the ALJ failed to give weight to claimant's treating physicians.  [rec. doc. 10, p. 8].

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton*, 209 F.3d at 455; *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

---

[3]Many courts, including the Fifth Circuit, have accepted television viewing as valid evidence that the plaintiff can concentrate, usually when other relevant facts accompany it and the RFC limits the plaintiff to simple tasks.  *See, e.g., Pratt*, 158 Fed.Appx. at 644-45 (noting that reading a newspaper, watching television, driving a car and speaking on the phone "suggest[ed] some ability to concentrate"); *Nace v. Comm'r of Soc. Sec.*, 2015 WL 1511055, at *26 (E.D. Mich. Mar. 25, 2015).

20

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence."  *Newton,* 209 F.3d at 455 (*citing* 20 C.F.R. § 404.1527(d)(2)).

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

Although claimant argues that the ALJ did not give great weight to the treating physicians' opinions, the record reflects that she did.  In fact, the ALJ specifically considered the records from Dr. O'Neil and Dr. Guillet, as well as those from Dr. Matt and the state agency medical consultant.  (Tr. 15-16).  This, this argument lacks merit.

Claimant also argues that the ALJ erred in finding claimant's pain complaints not credible where the treating physician's "never expressed any doubt about claimant's pain complaints or accused [her] of malingering."  The authorities cited by claimant for this proposition are from outside of this Circuit and are not binding on this Court.  *Sand v. Shalala*, 820 F.Supp. 1299, 1308 (D.

Kansas 1993) (ALJ should consider the fact that none of the treating physicians ever expressed doubt about the plaintiff's complaints of pain or accused him of malingering); *see also Colon v. Secretary of Health & Human Servs*., 788 F.Supp. 671 (D. Puerto Rico 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994).

In the Fifth Circuit, one of the factors relevant to the credibility analysis is whether a physician finds  claimant disabled.  *Ramirez v. Colvin*, — Fed.Appx. —, 2015 WL 1607346 (5th Cir. April 10, 2015); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was physically disabled).  That is not the case here.  Accordingly, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to

furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

June 11, 2015, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

23